**SO ORDERED.**

**SIGNED this 29 day of December, 2017.**

*Stephani W. Humrickhouse*
Stephani W. Humrickhouse
United States Bankruptcy Judge

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
WILMINGTON DIVISION

| | |
|---|---|
| IN RE: | CASE NO. |
| GARY SCOTT EDWARDS | 17-02821-5-SWH |
|  | CHAPTER 13 |
| DEBTOR | |

### ORDER REGARDING VALUATION OF COLLATERAL

The matter before the court is the Motion for Confirmation of Plan filed by the chapter 13 trustee on August 10, 2017 (Dkt. 26; the "Motion") and Objection to Confirmation of Plan filed by 21st Mortgage Corporation ("21st Mortgage" or the "Creditor") on August 28, 2017 (Dkt. 27; the "Objection"). A hearing took place on November 9, 2017, in Wilmington, North Carolina. At the conclusion of hearing, the court took the matter under advisement. Based upon a review of the pleadings, the case record, and the arguments of counsel made at the hearing, the court makes the following findings of fact and conclusions of law.

### BACKGROUND AND FACTS

Gary Scott Edwards ("Mr. Edwards" or the "Debtor") filed a voluntary petition for relief under chapter 13 of the Bankruptcy Code on June 8, 2017. On Schedule A/B filed with the petition, Mr. Edwards listed ownership of a 2002 General Manufacturing 24' by 48' doublewide mobile home (the "Mobile Home") and scheduled its present value as $11,800. On Schedule D, Mr.

1

Edwards listed 21st Mortgage as a creditor holding a claim in the approximate amount of $28,054 secured by the Mobile Home.

Mr. Edwards purchased the Mobile Home on September 6, 2013 from Terry Pate Home Sales in Lumberton, North Carolina. The cash price of the Mobile Home, including applicable sales tax, was $39,500. Mr. Edwards paid $8,000 as a down payment and financed the balance at an interest rate of 9.25%. As part of the transaction, Mr. Edwards executed a Consumer Loan Note, Security Agreement, and Disclosure Statement (the "Note"), in which he granted 21st Mortgage a security interest in the Mobile Home. The Mobile Home was delivered to Mr. Edwards' property in Bladenboro, North Carolina, where it has since remained and been used continuously as his residence. The Mobile Home is not permanently affixed to the underlying real estate and is therefore personal property.

21st Mortgage filed an amended proof of claim on June 26, 2017 in the amount of $27,221.04 on June 26, 2017 (Claim No. 1-2). In support of its secured claim, 21st Mortgage attached a copy of the Note and a certificate of title issued by the North Carolina Department of Transportation, Division of Motor Vehicles, which reflects its first position lien on the Mobile Home in accordance with N.C. Gen. Stat. §§ 20-58 and 25-9-311(a)(2).

In the Motion, Mr. Edwards proposes to retain the Mobile Home and bifurcate 21st Mortgage's claim. He proposes to pay 21st Mortgage the sum of $8,000 at 6% interest over the life of the plan, with the remaining balance of $19,221.04 to be treated as unsecured.

**A. Debtor's Testimony**

At the hearing, Mr. Edwards testified extensively and credibly as to the Mobile Home's condition. He began by clarifying that while a set of steps was included with the Mobile Home at delivery, no appliances were included in the initial purchase. Instead, Mr. Edwards stated that he

2

"added a washer, dryer, stove, fridge, and air conditioner" upon the delivery of the home to his property and has since replaced the stove and refrigerator. He further explained that the Mobile Home experienced significant flooding in late 2013, which resulted in standing water in the structure for some period of time. In order to quickly drain the standing water, Mr. Edwards "cut holes under the home through the insulation." He has not repaired or patched the holes underneath the home and is unaware as to the full extent of the resultant long-term damage to the home's undercarriage. Additionally, the flooding caused portions of the home's flooring to "rot out," and Mr. Edwards contends that replacement of the affected flooring is therefore necessary.

The Mobile Home's roof began to leak in 2013. While Mr. Edwards successfully patched the roof such that it is not "actively leaking," he contends that the entire roof is in need of replacement. In addition to the water damage, Mr. Edwards explained that other interior components of the Mobile Home are in disrepair. Specifically, both the front and back doors require replacement, as neither door fully closes or securely locks at present. A bedroom window was broken some time ago, and Mr. Edwards has sealed the broken window with a plastic bag in the interim. Mr. Edwards stated that these items are in "imminent need of repair . . . for [his] safety."

In total, Mr. Edwards testified that he believes that over $8,000 of repairs to the Mobile Home are required. He allocated approximately $5,000 to the roof's replacement, $1,500 to the replacement of both doors, and $1,500 to repair and replace the rotted flooring.

**B. Debtor's Expert's Testimony**

Mr. Edwards presented Mr. James "Jimmie" Smith as an expert witness regarding used manufactured home valuation in the southeastern North Carolina area. Mr. Smith's credentials were outlined in the record, including his experience in appraising and auctioning approximately

100 manufactured homes in the Bladen County, North Carolina region throughout his twenty-two year career as a licensed auctioneer. Mr. Smith is also a licensed broker in the state of North Carolina and served as a Bladen County Commissioner for over twenty years until his retirement in December of 2016. As a commissioner, Mr. Smith regularly revalued manufactured homes and real estate for county ad valorem tax purposes. Mr. Smith was tendered and accepted as an expert witness in the case.

Mr. Smith began by testifying that he visited and physically inspected the Mobile Home in October of 2017. Based upon his personal inspection, he explained that the Mobile Home "needs a new roof" and that the roof's replacement is a "necessary repair," as the shingles are significantly weathered. He further testified that the Mobile Home's doors need to be replaced, that the back rooms show signs of water damage, and that portions of the Mobile Home's ceiling are also in poor condition. Mr. Smith provided a written evaluation of the Mobile Home (the "Debtor's Appraisal"), which lists an appraised value of $17,200. See Debtor's Ex. 2. In arriving at this figure, Mr. Smith explained that he first consulted various workbooks and guides to determine a baseline value of the Mobile Home, given its year, make, and model. From there, he adjusted the assessed value to reflect the Mobile Home's current condition and deducted the amounts required to complete the required repairs.

**C. Creditor's Expert Testimony**

21st Mortgage presented Mr. Robert A. Keck as an expert witness regarding used manufactured home valuation, and his credentials were accordingly summarized on the record. Mr. Keck previously served as a quality assurance manager for Clayton Homes for thirty years. In that role, he inspected over 65,000 mobile homes. At present, Mr. Keck owns R. Keck Enterprises, LLC and is based out of New Tazewell, Tennessee. Through his LLC, Mr. Keck

4

regularly appraises manufactured homes for lenders, conducts inspections for the United States Department of Housing and Urban Development, and refurbishes manufactured homes at dealer lots. In the past year, Mr. Keck valued approximately ninety manufactured homes and earned over $19,000 from 21st Mortgage for performing appraisals. Mr. Keck was tendered and accepted as an expert witness regarding manufactured home appraisals and refurbishing costs.

Mr. Keck testified that he personally visited and inspected the Mobile Home on October 19, 2017 and prepared a written appraisal report (the "Creditor's Appraisal") on October 20, 2017. See Creditor's Ex. C-1. Mr. Keck explained that he employs the National Appraisal System ("NAS") in evaluating a mobile home's "as-is value," which is a cost-approach method. The first step in the NAS appraisal process is to establish a base value pursuant to the NADA Guide Book retail value. Next, he adjusts that figure for the specific mobile home's geographic location by using a prescribed multiplier. Mr. Keck then accounts for a home's present condition by assigning one of four possible subjective condition determinations, as defined by the NAS Guidelines, to a home: excellent, good, fair, or poor. The NAS Guidelines provide the following definitions of each categorical term:

> Excellent – home is new, or like new, very attractive, and highly desirable; good – normal wear and tear is visible, but the home is well maintained, still attractive, desirable, and useful; fair – minor deterioration apparent due to both the climate and deferred maintenance, less attractive but obviously useful; poor – signs of structural deterioration, obvious missing or broken component items, definitely undesirable, and marginally useful.

Creditor's Ex. C-1, Page 4.

Based upon the subjective condition determination, the value is either discounted if a home is in "fair" or "poor" condition or adjusted upwardly if a home is in "good" or "excellent" condition. Finally, the value is adjusted for the cost of replacing missing axles and wheels, the

5

cost of repairs, and the added value of any accessions or other accessories. The figure is then rounded to the nearest hundredth dollar to arrive at an "estimated market value in present condition."

In this case, Mr. Keck employed a baseline value of $20,834.56 for the Mobile Home, which corresponds to the NADA Guide Book retail value for its year, make, and model. This figure was adjusted for the Mobile Home's location in the state of North Carolina by using a multiplier of 1.01. As a result, the initial baseline value was $21,000.[1] Mr. Keck then applied a "condition adjustment" to this number in order to reflect that the Mobile Home is in "good" condition in his opinion, as defined by the NAS Guidelines. Accordingly, he applied a multiplier of 112 percent, which resulted in an adjusted value of $23,500. From there, Mr. Keck deducted $1,183, which represents the cost to replace missing wheels, tires, a tow bar, and axles. Finally, Mr. Keck added $6,644 for additional components,[2] $2,100 for a foundation system, and $1,653 for accessories.[3] In total, Mr. Keck arrived at a final appraised value of $31,900 for the Mobile Home in its present condition based on the NAS method.

As an alternative to the NAS method, Mr. Keck sought information as to the retail price of Mobile Home by telephoning three vendors in the southeastern North Carolina area. He specifically inquired what price each vendor would charge for the Mobile Home in its present state and what price each vendor would charge if repairs were completed such that it was in "sellable" condition. Mr. Keck defined the term "sellable" as meaning the "retail price on [a vendor's] lot,

---

[1] The NAS Value Summary Form instructs an appraiser to round the multiplied figure to the nearest hundredth dollar.
[2] The NAS Guidelines define a component as "anything which is built into the manufactured home or added to it in such a way that it becomes an essential part of the home. . . ." Here, Mr. Keck added a total of $6,644 to his appraised value for components, representing the values of: storm windows, carpeting, bathroom fixtures, two tubs, a tub enclosure, appliances, a furnace, a water heater, drapes, a fireplace, smoke detectors, and ceiling fans.
[3] The NAS Guidelines define an accessory as "a feature or item which goes with the home, but is not built-in or permanently attached to the home (e.g. skirting, awnings, porch/decks, etc.)." Here, Mr. Keck added a total of $1,653 for accessories, representing an air conditioning system, a porch, a set of steps, and metal skirting.

completely restored." He averaged the three present values provided by vendors and arrived at a base figure of $31,100. Mr. Keck explained that in order to sell the home through a retail dealer, approximately $8,015 of repairs would be required, such that the final retail price of the Mobile Home would be $39,115.

Based upon his personal testimony and Mr. Smith's appraisal and testimony, Mr. Edwards seeks to value the Mobile Home at approximately $13,080. On the other hand, based upon Mr. Keck's appraisal and testimony, 21st Mortgage seeks to value the Mobile Home at $31,900. Accordingly, the court must determine the proper value of the Mobile Home for chapter 13 plan confirmation purposes in light of the Debtor's opinion, the experts' respective testimony and appraisals, and all other evidence before it.

## DISCUSSION

### A. Valuation Standard for "Cram Down" Purposes

In order to be confirmed, a chapter 13 plan must provide "the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim. . . ." 11 U.S.C. § 1325(a)(5)(B)(ii). In effect, this allows a debtor to retain a piece of collateral so long as he or she pays the secured creditor the present value of the collateral over the life of his or her chapter 13 plan. This option is colloquially referred to as a "cram down." *In re Martin*, 444 B.R. 538, 545 (Bankr. M.D.N.C. 2011). When a debtor seeks to "cram down" a creditor's claim, a court must first determine the collateral's value pursuant to § 506(a). Because the property at issue in this case is personal in nature, the applicable statutory provision is § 506(a)(2), which provides:

> If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing. With respect to property acquired

7

> for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined.

11 U.S.C. § 506(a)(2). Section 506(a)(2) codifies the holding of *Associates Comm. Corp. v. Rash*, 520 U.S. 953 (1997). In *Rash*, the Supreme Court of the United States held that replacement value is the appropriate valuation standard for purposes of § 506(a)(2), and replacement value should represent the "cost the debtor would incur to obtain a like asset for the same 'proposed . . . use.'" *Rash* at 965. The determination of replacement value requires a fact-intensive analysis. *Id.* at n. 6 (clarifying that "[the Supreme Court's] recognition that the replacement-value standard . . . governs in cram down cases leaves to bankruptcy courts, as triers of fact, identification of the best way of ascertaining replacement value on the basis of the evidence presented").

**B. Scope of Security Interest**

In order to properly assess the replacement value of the Mobile Home, the court must first determine the scope of 21st Mortgage's security interest in the pledged collateral under state law. *See In re Eaddy*, 2016 WL 745277, at *5 (Bankr. D.S.C. Feb. 23, 2016) (explaining that determining valuation "necessarily requires a court to consider the value of the collateral . . . [to] the extent to which the security interest attaches to the collateral under state law") (citations omitted). Only those items subject to 21st Mortgage's properly perfected security interest will be included in the valuation calculation. *Id*. Here, because the Mobile Home is not affixed to real property, it remains personal property for purposes of lien recordation and perfection. 21st Mortgage's lien was properly recorded, perfected, and notated on the Mobile Home's certificate of title. N.C. GEN. STAT. §§ 20-58 and 25-9-311(a)(2).

1. **Attachment**

In order for a security interest to attach to a piece of collateral, three conditions must be satisfied: (1) value must be given, (2) the debtor must have rights in the collateral or the power to transfer rights in the collateral, and (3) the debtor must authenticate a security agreement that provides a description of the collateral. N.C. GEN. STAT. § 25-9-203(b). Importantly, the description contained in the security agreement must "reasonably identif[y]" the collateral to which the interest will attach. N.C. GEN. STAT. § 25-9-108(a). A description of collateral is sufficient if it contains a "(1) specific listing; (2) category; . . . (3) a type of collateral defined in this Chapter; (4) quantity; (5) computational or allocational formula or procedure; or (6) . . . any other method, if the identity of the collateral is objectively determinable." N.C. GEN. STAT. § 25-9-108(b). The purpose of the description is to "make possible the identification of the collateral described." In this case, the Note provides the following:

> To secure payment of all sums due or which become due under this Note . . . Borrower grants Lender a first priority security interest in . . . the Manufactured Home, and all accessions, attachments, accessories, replacements and additions to the Manufactured Home, whether added now or later . . . and . . . proceeds and products of all of the foregoing.

Proof of Claim No. 1-2, Ex. A. However, the Note also states that "Lender is not granted, and does not have, a non-purchase money security interest in household goods." *Id.* The first paragraph of the Note begins by defining the Mobile Home as "the manufactured home described below, together with the related services, furnishings, equipment, appliances, and accessories *included* with the manufactured home." Proof of Claim No. 1-2, Ex. A (emphasis added). Based upon the explicit language contained in the authenticated Note, the court concludes that 21st Mortgage's security interest properly attached to the Mobile Home and all accessions, attachments, and included accessories.

9

However, 21st Mortgage's security interest did *not* attach to the stove, refrigerator, washer, dryer, and air conditioning unit, all of which were purchased separately by Mr. Edwards following delivery of the Mobile Home. Those five appliances are also not itemized on the Note and exist as ordinary, unencumbered consumer goods. The court will therefore exclude the value of the stove ($254), refrigerator with ice maker ($640), washer, dryer, and air conditioning unit ($767) from its analysis because they are not included in 21st Mortgage's collateral.

**2. Perfection**

The court has established the extent to which 21st Mortgage's security interest properly attached to the Mobile Home. However, this does not conclude the inquiry. The court must next consider the extent to which 21st Mortgage's security interest is perfected.

A notation on a certificate of title perfects only a lien on a vehicle and all accessions thereto. *See* N.C. GEN. STAT. §§ 20-58, 25-9-311(a)(2), and 25-9-335; *see also In re Sweeney*, 556 B.R. 208, 214 (Bankr. E.D.N.C. 2016) (concluding that "any non-accession items located within or adjoining the manufactured home must be perfected by another method, such as the recording of a UCC-1 financing statement"). As a result, it is necessary for the court to determine which components of Mr. Edwards' Mobile Home constitute accessions. Those items that do not qualify as accessions are subject only to an *unperfected* lien held by 21st Mortgage, as no UCC-1 financing statement exists in the record, and will accordingly be excluded in the calculation of the Mobile Home's replacement value.

Accessions are "goods that are physically united with other goods in such a manner that the identity of the original goods is not lost." N.C. GEN. STAT. § 25-9-102(a)(1). Courts in North Carolina employ a two-part test in determining whether a good is physically united with another. *Goodrich Silvertown Stores v. Caesar*, 197 S.E. 698, 700 (N.C. 1938). Specifically, a court must

10

first consider whether the good at issue has become an "integral part of the property" and then consider whether the good "could be conveniently detached." *Id*. If a good is an integral part of the property and cannot be conveniently detached, then it is considered to be an accession. *See In re Cranford*, No. 12-10724C-13G, 2012 WL 5939967, at *2 (Bankr. M.D.N.C. Nov. 27, 2012) (applying the two-part test and concluding that a heat pump and set of steps could "be detached without damaging the mobile home" and have not become a 'commingled, integral part of' the mobile home") (citations omitted); *see also In re Hardy*, No. 15-05431-5-JNC, 2016 WL 3549078, at *3 (Bankr. E.D.N.C. June 21, 2016) (finding that an outside porch and deck were not accessions to a mobile home and therefore were "not subject to the Creditor's lien").

In this case, it is clear to the court that the following items are not accessions, as they are not permanently integrated with the Mobile Home and are readily detachable from it: drapes, two smoke detectors, two ceiling fans, a set of steps, and a 4' by 4' porch. Because these items are non-accession goods, 21st Mortgage's notation of the Mobile Home is insufficient to perfect a security interest in them. As a result, the respective values of these four items will therefore be excluded from the court's analysis.

**C. Valuation of Mr. Edwards' Mobile Home**

**1. Appraisals**

When presented with multiple appraisals, a court retains broad discretion in weighing each expert's opinion regarding valuation. *In re Bate Land & Timber, LLC*, No. 16-2037, 2017 WL 6031846, at *6 (4th Cir. Dec. 6, 2017). Specifically, "the bankruptcy court weighs the qualifications, credibility, and conclusions of each party's expert." *Id*.; *see also In re Sailboat Props., LLC*, No. 10-03718-8-SWH, 2011 WL 1299301, at *6 (Bankr. E.D.N.C. Mar. 31, 2011) (explaining that a court "must determine . . . 'value based on the credibility of the appraisers, the

11

logic of their analyses, and the persuasiveness of their subjective reasoning'") (quoting *In re Atlanta S. Bus. Park Ltd.*, 173 B.R. 444, 450 (Bankr. N.D. Ga. 1994)); *In re Smith*, 267 B.R. 568, 572 (Bankr. S.D. Ohio 2001) (noting that a court may consider a number of factors, including "the appraiser's education, training, experience, familiarity with the subject of the appraisal, manner of conducting the appraisal, testimony . . . and overall ability to substantiate the basis for the valuation" in valuing a mobile home). However, courts are not conclusively bound by the valuation figures contained in competing appraisals and may reach a different conclusion regarding value after interpreting all evidence. *See generally Sailboat Props., LLC*, 2011 WL 1299301, at *6.

In this case, Mr. Keck is a qualified expert who credibly testified as to his valuation methods. He explained that he personally inspected the Mobile Home for nearly two hours before assessing its value. However, he exhibited a lack of disinterestedness in his testimony. Mr. Keck testified that he only performs appraisals for lender clients and exclusively testifies on behalf of creditors. This fact does not discount his valuation figure or undermine his appraisal method, but the court takes his potential bias into consideration in weighing the evidence before it. *See, e.g.*, *Sweeney*, 556 B.R. at 218 (explaining that a court is justified in "taking [a creditor's appraiser's] valuation with [a] proverbial grain of salt" based upon his or her lack of independence).

The Debtor's appraiser, Mr. Smith, is clearly familiar with the southeastern North Carolina area and its real estate market. He demonstrated specific knowledge regarding the values of mobile homes in Bladen County, North Carolina. The court recognizes that such familiarity with the local market is especially useful in determining the replacement value of collateral. However, Mr. Smith's written appraisal is conclusory and lacks detail. It summarily states an appraised value with a few vague comments as to the Mobile Home's present condition, such as "damage in master

12

bath." Debtor's Ex. 2. Mr. Smith expounded upon his written appraisal during his testimony by explaining the process he undertook to arrive at a final valuation figure, but the reliability and consistency of his chosen methodology are not immediately clear to the court.

**B. NADA/NAS Appraisal Method**

Bankruptcy courts routinely employ the NADA/NAS method in valuing manufactured homes, as it offers a formulaic and standardized valuation approach. *See, e.g*, *Eaddy*, 2016 WL 745277, at *7 (Bankr. D.S.C. Feb. 23, 2016) (explaining that NADA/NAS valuations "are utilized with increasing frequency in bankruptcy courts and are generally accepted"). However, the NADA value represents the starting point in a court's mobile home valuation analysis, and a court is free to adjust the value based upon the evidence presented in a particular case. *In re Brown*, 560 B.R. 188, 194 (Bankr. E.D.N.C. 2016) (explaining that "this district finds a NADA value to be a starting point for use in determining the correct retail value of personal property for plan cram down purposes"); *see also In re Russell*, 211 B.R. 12 (Bankr. E.D.N.C. 1997) ("the starting point for valuation of an automobile to be retained . . . has been the NADA retail value *with adjustment . . .*") (emphasis added).

In this case, the court accepts the baseline NADA value of $21,000 asserted by Mr. Keck, which reflects the Mobile Home's make, model, and age and accounts for its location in North Carolina. However, after considering testimony and evidence presented at the hearing, the court finds that the Mobile Home's condition is between "good" and "fair" pursuant to the defined NAS condition criteria. The court arrives at this conclusion based in part on the unknown condition of the undercarriage of the Mobile Home following the water damage sustained in 2013, as neither expert nor Mr. Edwards testified regarding its present state. Mr. Keck did not "go under the house" when conducting his inspection and therefore did not include its potential damage in his valuation

13

analysis.  In addition, while all parties agree that the Mobile Home is well-maintained, the court finds that "minor deterioration is apparent," as described by the NAS definition of "fair" condition, based upon Mr. Edwards' description of the roof, water damage, and interior of his home as well as the age of the home.  As a result, the court will apply a condition adjustment of 100% to the baseline NADA value.[4]

Furthermore, it is clear to the court that the Mobile Home is in need of various repairs.  Mr. Keck estimated that all repairs could be completed for $825.  Mr. Keck's estimate includes the following: $100 to extend short vinyl siding; $100 to replace seals of the front door; $325 to replace the back door and repair its surrounding floor; $150 to repair the subfloor of the master bedroom closet; $100 to replace the broken window; and $50 to install two carpet bars in two bedrooms. Notably, Mr. Keck did not deduct any amount for the repair of the roof in his written appraisal but testified that the cost to partially repair the roof would total $2,000.  On the other hand, Mr. Smith contended that both the front and back doors needed to be replaced at an approximate cost of $1,100 and that the replacement of the Mobile Home's roof would cost between $5,000 and $5,500.

While the extent of the roof's damage is not agreed upon, the court finds that at least $3,500 is needed to repair the roof to an acceptable standard, thereby increasing the total repair costs to $4,325.  The court further finds that Mr. Keck's estimates for other necessary repairs, such as replacement of the broken window, are low, perhaps reflecting a non-market approach to costs inasmuch as he personally refurbishes and repairs homes.  As a result, the court concludes that a deduction of a total of $5,500 is required to account for *all* required, structural repairs, including

---

[4] The NAS guidelines instruct an appraiser to apply a multiplier of 112% to a mobile home in "good" condition and a multiplier of 82% to a home in "fair" condition.  Because the Mobile Home's condition falls in between these two categorical descriptors, the court will apply a multiplier of 100%.

14

the flooring damaged by water, broken window, and faulty doors.

After considering all of the evidence presented and testimony offered, the court finds that the Mobile Home's value for plan confirmation purposes is $20,714. The following chart summarizes the appropriate additions and deductions in arriving at said value:

| | |
|---|---|
| NADA Value (Starting point, based upon Mobile Home's year, make, model, and location) | $21,000 |
| Add value of accessions (Rolled roof, siding, storm windows, carpeting, two tubs, tub enclosure, furnace, water heater, fireplace) | $4,297 |
| Add value of foundation system | $2,100 |
| Less cost of repairs (Roof, doors, flooring, window) | ($5,500) |
| Less values of missing wheels, axle, and tow bar | ($1,183) |
| **TOTAL** | **$20,714** |

## CONCLUSION

Based upon the foregoing, the court finds the replacement value of the Mobile Home to be $20,714. Mr. Edwards is directed to file an amended chapter 13 plan within fourteen (14) days to reflect this value.

**END OF DOCUMENT**